**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Janet NORTON, Defendant–Appellant.**

**No. 01–8040.**

United States Court of Appeals,
Tenth Circuit.

April 23, 2002.

Before EBEL, GIBSON *, and JOHN C. PORFILIO, Circuit Judges.

ORDER AND JUDGMENT **

JOHN C. PORFILIO, Senior Circuit Judge.

After pleading guilty to a single count of conspiracy to possess with intent to distribute methamphetamine in violation of 21

---

* The Honorable John R. Gibson, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

** This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of

U.S.C. §§ 841(a)(1), 841(b)(A) and 846, Janet Norton was sentenced to a term of incarceration of 120 months, which included a two-level increase for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). In this appeal, Ms. Norton challenges the factual and legal basis for the increase, contending it was clearly improbable the firearm she possessed was connected with the offense. Because the sweep of U.S.S.G. § 2D1.1(b)(1) is broad, we must disagree and affirm.[1]

With the assistance of Ole Peck, a confidential informant, Lincoln County Sheriff Jody Gardner gathered information about the methamphetamine trade in Star Valley, Wyoming. That investigation targeted Janet Norton whose Jeep Laredo, driven by another seller, was eventually stopped, producing sufficient methamphetamine to support the issuance of a warrant to search Ms. Norton's home. That search produced drug paraphernalia, syringes, glass pipes, pay-owe ledgers, packaging materials, and $1,600 in cash. Tucked under clothing in her bedroom dresser drawer was a silencer made from the purple casing of a Mag Lite flashlight, the capped end drilled, the other end threaded. In plain view in a garage located a short distance from the dwelling,[2] deputies seized an unloaded Tec .22 semi-automatic pistol and two banana-style ammunition clips, one of which was fully loaded.

Ms. Norton pled guilty to a single charge of conspiracy to possess with intent to distribute methamphetamine but objected to the PSR's recommendation to increase her base offense level under § 2D1.1(b)(1), which provides for such an increase "[i]f a dangerous weapon (including a firearm) was possessed." Ms. Norton supported the objection with the explanation she had purchased the gun at her ex-boyfriend's insistence and only continued to keep it for her personal safety after their relationship ended acrimoniously. She added she stored the gun unloaded in her bedroom closet and kept the ammunition in a separate location because she worried about her children's finding a loaded firearm.

At the hearings[3] on her objection, Sheriff Jody Gardner, who executed the search warrant along with four deputies, stated although Ole Peck alerted him to the purple silencer he had built, he did not know of any weapons at the residence and had not listed firearms on the search warrant. Although Ms. Norton sold methamphetamine to Ole Peck once in the garage, he did not tell Sheriff Gardner he saw a firearm. Sheriff Gardner also testified he had previously responded to a domestic dispute involving Ms. Norton's ex-boyfriend, Glenn Ebertshaeuser, whom Ms. Norton had asked to move out. He stated he did not know if the Tec .22 was loaded when it was seized, whether the banana clips fit, or if

---

orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

**1.** We are aware of the pendency of *United States v. Harris*, 243 F.3d 806 (4th Cir.2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 663, 151 L.Ed.2d 578 (2002), yet we believe we are constrained by our precedent to reach this conclusion.

**2.** This separate structure is variously called an outbuilding, garage, or outbuilding/garage. No testimony established the exact distance

between the residence and garage, but it was estimated to be between 20 to 40 feet. A cement path connected the two structures.

**3.** At the first sentencing hearing on May 11, 2001, the government's chief witness, Sheriff Jody Gardner, testified but did not have for the court's review a videotape of the search, photographs referred to in his testimony, or the Tec .22 and silencer. Constrained to rule on such an incomplete record, the court convened a second hearing on May 17, 2001.

the gun worked. He testified Ms. Norton was nicknamed Purple Janet and Purple Lady after her favorite color, as evidenced by the purple silencer.

Ms. Norton testified, describing how Mr. Ebertshaeuser instigated her buying the gun at a Jackson Hole pawnshop. She said she fired the gun twice in her yard to see if it worked. After their relationship soured and she asked Mr. Ebertshaeuser to move out, she described enlisting her landlord's and the sheriff's help to escort Mr. Ebertshaeuser from her property. She explained that although she kept the gun fearing her ex-boyfriend's volatility, she worried that it was dangerous to have a weapon around her two young children; thus, she had moved it out of her bedroom closet to the garage. She stated she intended to get rid of it. Acknowledging she had purchased the gun and knew how to shoot it, she did not disagree that during the time of the conspiracy, she had methamphetamine and paraphernalia used for the drug's ingestion in her bedroom "in close proximity to the Intertech .22 pistol."

In her testimony, Ms. Norton conceded the weapon was present when she did drug deals, but she clarified, she did not do drug deals in her bedroom. This assertion prompted the following exchange with the government.

Q. I understand. But you did drug deals in your home. Is that—

A. Yes.

Q. —correct? And that weapon would have been available for you to protect yourself had one of those drug deals gone bad. Isn't that correct?

A. Yes, I suppose.

Defense counsel endeavored to qualify this testimony with the facts that Ms. Norton sold only to her friends and acquaintances and kept the gun for self-protection. There was no testimony that Ms. Norton carried, brandished, or accessed the gun during the conspiracy. Ole Peck did not testify nor did any of Ms. Norton's co-conspirators.

Rejecting defense counsel's characterization of the increase as particularly harsh in this instance[4] and disproportionate to the treatment afforded Ms. Norton's co-conspirators,[5] the court found Ms. Norton purchased and shot the firearm, knowing of its potential as a weapon. It noted the gun could not be classified as a hunting weapon nor even as a handgun given its fire power with twenty-four rounds stored in each clip. Observing it was plausible Ms. Norton kept the weapon, in part, to protect her from her former boyfriend, the court found "it also clearly follows that that weapon would have had useful purposes for her drug-trafficking business," and noted the sale from the garage within a two week period before its seizure. The court further noted the garage "was literally a dozen steps away from the back door of her dwelling" and was not "a terribly well-secured facility," both permitting "easy access to that gun." Citing *United States v. Goddard,* 929 F.2d 546 (10th Cir. 1991), and *United States v. Nguyen,* 1 F.3d 972 (10th Cir.1993), the court agreed with the government's contention it did not have to establish a connection between the weapon and the offense, sealing the conclusion Ms. Norton "may have wanted [the firearm] for a legitimate purpose of self-defense [but that] doesn't obviate the fact that it was also available for illicit pur-

---

4. Ms. Norton is a British citizen. Defense counsel speculated Ms. Norton might be subject to deportation, separating her permanently from her children, after she served her sentence.

5. The sentences of Ms. Norton's co-conspirators did not include a § 2D1.1(b)(1) increase.

poses ... protecting her from drug-trafficking transactions gone awry." It concluded the weapon was present as defined by the Guidelines and applied the two-level increase to her sentence.

In this appeal, Ms. Norton contends the government failed to show any relationship between her possession of the firearm and the drug conspiracy, emphasizing (1) the spatial disconnectedness of the weapon from any drugs or drug paraphernalia, all of which were found in the house; (2) the temporal detachment between the gun and any prior drug sales; and (3) the absence of the firearm from any drug activity. Because none of these facts preponderate, Ms. Norton insists she met her burden of establishing it was clearly improbable the weapon was connected to the offense.

To decide whether U.S.S.G. § 2D1.1(b)(1) was properly applied, we review legal questions *de novo* and factual findings for clear error, giving due deference to the sentencing court's application of the Guidelines to the facts. *United States v. Pompey*, 264 F.3d 1176, 1180 (10th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 929, 151 L.Ed.2d 892 (2002). Application of the two-level increase derives essentially from a factual determination which we must ultimately judge under a clearly erroneous standard.

The comment to U.S.S.G. § 2D1.1(b)(1) instructs "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1), cmt. n. 3 (2000). "[T]he Guidelines require only that a preponderance of the evidence support a finding that the circumstances surrounding the gun's presence do not make it 'clearly improbable' that the gun was connected to the offense." *Goddard*, 929 F.2d at 549.

"[T]he focus of § 2D1.1(b)(1) is whether [defendant] possessed a firearm in connection with the offense to which he pleaded guilty." *United States v. Dickerson*, 195 F.3d 1183, 1188 (10th Cir.1999). In this case, the government had only to show the Tec .22 was possessed during the commission of the drug offense, here, the conspiracy. The government could fulfil this burden by providing evidence of a temporal and spatial relation between the firearm and the drug activity. *Id.* However, "[i]t is clear when the offense committed is conspiracy, these proximity conditions are met when the weapon is discovered in a place where the conspiracy was carried out or furthered." *United States v. Apple*, 962 F.2d 335, 338 (4th Cir.1992). Here, as in *Apple*, drug transactions occurred at Ms. Norton's house. Section 2D1.1(b)(1) does not require a perfect fit between the gun's storage in the bedroom and drug sales from the bedroom.[6] Indeed, although there was no evidence to show Ms. Norton carried, brandished, loaned, accessed, or held the Tec .22 during any drug transaction or that the weapon was present, nearby, the uncontroverted evidence that she *possessed* a dangerous weapon, U.S.S.G. § 2D1.1(b)(1), during the course of the conspiracy overrides. That she didn't discuss it (*Pompey*, 264 F.3d at 1181)(telephone conversation defendant succeeded in obtaining a gun), keep it near drug sales (*United States v. Heckard*, 238 F.3d 1222, 1233 (10th Cir.2001)(gun in locus where repeated drug sales occurred), or brandish it (*Nguyen*, 1 F.3d at 974)(though gun

---

**6.** Ms. Norton insisted she never sold drugs out of her bedroom. Instead, she said she stored the methamphetamine in her purse.

wrapped in towel stored in closet, defendant bragged about pulling it on a dealer), she possessed it in a location where some of the activities of the drug conspiracy occurred. The breadth of this "locus for drug trafficking," *Heckard,* 238 F.3d at 1233, dwarfs the clear improbability this firearm was connected with the offense.

Thus, the district court's application of U.S.S.G. § 2D1.1(b)(1) was not clearly erroneous. We therefore AFFIRM the sentence.